**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | | |
|---|---|---|
| JOHNNY LOVE, as Special Administrator of The Estate of MARY ALICE LOVE, | ) | |
| Plaintiff | ) | No. |
| v. | ) | |
| CHRISTOPHER BRIGANO, VILLAGE OF MUNDELEIN, ILLINOIS, | ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | |

## COMPLAINT

NOW COMES the plaintiff, JOHNNY LOVE, as Special Administrator of the Estate of MARY ALICE LOVE, and alleges the following against the Defendants, CHRISTOPHER BRIGANO and VILLAGE OF MUNDELEIN, ILLINOIS (hereinafter "Defendants"):

## Jurisdiction

1. This action is brought against the Defendants pursuant to Section 1983 of the Ku Klux Klan Act of 1871, 42 U.S.C. § 1983, as amended.

2. Jurisdiction of this Court arises under 28 U.S.C. § 1331 because the Complaint asserts federal claims and requires the resolution of substantial questions of federal law.

3. Venue in this district is proper under 28 U.S.C. § 1391 because a substantial part of the events and omissions complained of took place in this District at and near 1123 Ashbrook Drive in Mundelein, Illinois.

## Parties

4. Plaintiff, JOHNNY LOVE, is the Special Administrator of the Estate of MARY ALICE LOVE, who is the father of the decedent, MARY ALICE LOVE. Plaintiff is the proposed

special administrator of the Estate of MARY ALICE LOVE. Upon the filing of this Complaint, Plaintiff will move to appoint JOHNNY LOVE, as the Special Administrator of the Estate of MARY ALICE LOVE.

5. Defendant CHRISTOPHER BRIGANO was at all relevant times a sworn officer in the VILLAGE OF MUNDELEIN, ILLINOIS. He is sued in his individual and official capacities.

6. Defendant VILLAGE OF MUNDELEIN, ILLINOIS is the local government unit that operates a police department and employs certain officers including the defendant CHRISTOPHER BRIGANO.

7. Defendants VILLAGE OF MUNDELEIN, ILLINOIS and CHRISTOPHER BRIGANO both reside in Lake County, Illinois.

8. Decedent, MARY ALICE LOVE, an African American female resided in Mundelein, Lake County, Illinois.

**<u>General Allegations</u>**

9. On May 11, 2026, Mary Alice Love was experiencing a mental health crisis at her family's residence in Mundelein, Illinois.

10. Recognizing that her daughter needed assistance—not law enforcement intervention—her mother, Jeffry Love, first contacted the non-emergency mental health crisis line seeking trained mental health professionals. Rather than dispatching or coordinating an appropriate behavioral health response, she was instructed to call 911.

11. When Jeffry Love called the police department, she pleaded with dispatchers not to allow officers to harm her daughter. According to the 911 tapes, she specifically begged officers not to kill MARY ALICE LOVE. The dispatcher for over eight minutes said to her "why would you think the police would hurt her" and was assured that "no harm would occur."

12. Betrand, MARY ALICE LOVE's sister, also called and told the dispatcher that MARY ALICE LOVE was bipolar and was not on medicine. She was specifically asked if MARY ALICE LOVE was violent to herself or others and she told them no. The family sought assistance, compassion, and trained crisis intervention—not an armed confrontation.

13. Despite responding to what they knew or reasonably should have known was a behavioral health crisis, responding officers entered the residence before waiting for or obtaining assistance from a mental health professional in violation of the Stephon Watts Act, officially known as the Community Emergency Services and Supports Act (CESSA), signed into law on August 25, 2021, *50 ILCS 754/1*.

14. CESSA requires 911 and emergency response operators to direct mental and behavioral health calls to specialized services that dispatch mental health professionals instead of police.

15. Sergeant CHRISTOPHER BRIGANO assumed command of the incident. Sergeant BRIGANO disregarded fundamental Crisis Intervention Team (CIT) principles and ignored well-established de-escalation practices that existed precisely to prevent tragic outcomes during encounters involving persons experiencing mental illness. Instead of slowing down the situation, creating time and distance, communicating calmly, and utilizing available crisis intervention techniques, officer BRIGANO rapidly escalated the encounter.

**Crisis Intervention Failures**

16. The evidence demonstrates that this incident represents a catastrophic failure of crisis intervention. CIT training exists because encounters involving persons experiencing mental illness require patience, communication, distance, and time. Officers are specifically trained that slowing an encounter frequently saves lives.

17. Among other failures, Sergeant BRIGANO, who was CIT trained, and responding officers:

- failed to appropriately recognize and respond to a behavioral health crisis;
- failed to utilize established de-escalation techniques;
- failed to create time and distance;
- unnecessarily accelerated contact with Ms. LOVE;
- failed to coordinate with available mental health professionals;
- unnecessarily entered the residence despite the absence of an immediate threat requiring such action;
- failed to listen to Jeffry love and assess the situation before storming to the back door;
- failed to separate family members when approaching a person undergoing a domestic or mental health crisis;
- gave up the shield which was the only defense against a knife or other weapon;
- used unnecessary force against Jeffry Love, thereby escalating an already fragile situation;
- failed to provide warnings before using deadly force; and
- employed deadly force when objectively reasonable alternatives remained available.

18. These actions were contrary to accepted law enforcement practices and contrary to the very purpose of Crisis Intervention Team training.

**Violations of PERF Guiding Principles and Illinois De-escalation Standards**

19. The conduct of Sergeant CHRISTOPHER BRIGANO and the responding officers was directly contrary to nationally accepted police practices, including the Police Executive Research Forum ("PERF") *Guiding Principles on Use of Force*, as well as the Illinois Law Enforcement Training and Standards Board ("ILETSB") curriculum governing crisis intervention, de-escalation, and the use of force.

20. PERF has become the national benchmark for modern policing practices regarding encounters involving persons experiencing behavioral health crises. Those principles emphasize that officers should use communication, time, distance, cover, and tactical repositioning to reduce the need for force whenever safely possible.

21. PERF further recognizes that officers responding to mental health crises should slow the pace of an encounter, avoid unnecessarily escalating confrontations, and exhaust reasonable alternatives before resorting to deadly force.

22. Likewise, Illinois has mandated comprehensive de-escalation training for law enforcement officers through the Illinois Law Enforcement Training and Standards Board. Illinois officers are trained that de-escalation is not merely a preferred tactic but an essential component of constitutional policing.

23. Officers are instructed to use verbal persuasion, active listening, emotional regulation, tactical patience, distance, shielding, and coordinated planning to safely resolve encounters whenever feasible.

24. The training specifically recognizes that individuals suffering from mental illness often require a different law enforcement response than criminal suspects and that creating additional time frequently reduces the likelihood that force will become necessary. The evidence demonstrates that Sergeant BRIGANO's conduct was inconsistent with these accepted principles in numerous respects, including:

- failing to recognize that the incident was fundamentally a behavioral health crisis rather than a criminal confrontation;
- failing to slow the pace of the encounter despite having no apparent immediate need to rapidly enter the residence;
- failing to wait for or coordinate with qualified mental health professionals after the family specifically sought crisis intervention assistance;
- unnecessarily entering the residence instead of maintaining containment and utilizing time as a de-escalation tool;
- allowing officers to physically engage and tackle Jeffry Love, thereby dramatically increasing the emotional intensity of the encounter;
- failing to establish meaningful communication with Mary Alice Love before using force;
- failing to provide clear verbal identification or warnings before discharging his firearm;
- failing to employ tactical repositioning, distance, shielding, or other available alternatives to deadly force;
- abandoning the fundamental CIT principle that officers should reduce emotional intensity rather than become contributors to it; and

- employing deadly force within seconds of Ms. Love reacting to what she perceived as officers attacking her mother.

25. Perhaps most troubling, this tragedy unfolded after Jeffry Love expressly warned the MUNDELEIN POLICE DEPARTMENT that her daughter was suffering a mental health crisis and pleaded with dispatch personnel not to allow officers to kill her. The MUNDELEIN POLICE DEPARTMENT therefore had actual knowledge that this incident demanded a measured crisis-intervention response rather than an immediate tactical entry by armed officers.

26. Instead of employing the patience and communication required by both PERF and Illinois standards, officers rapidly escalated the encounter until deadly force became the foreseeable—and ultimately fatal—result.

**Failures in the Encounter with Mary Alice Love**

27. First, Sergeant Brigano was the commanding officer on scene and should have been guiding other officers to intervene and not leading the encounter. Watt's law has been in place for over four years which requires officers who receive a mental health call to dispatch mental health professionals. They are supposed to form a perimeter and wait for the mental health professionals to de-escalate the situation.

28. Second, there was complete mismanagement of the call due to failure to assess that escalated the situation. Jeffry Love invited officers into her home because she was ill and not dressed. As the officers approached her door she said, "first I need to know what you are going to do," in concern they were going to escalate the situation. She was assured by the officers that they were there to help. The lead officer entered with a shield. Jeffry asked, "don't you want to know what is going on?" They said yes but then as she started explaining what was happening, they turned away from her and started talking to each other.

29. Third, Officer Brigano told the other officer to give his shield to the third officer sitting outside giving them no protection.

30. Fourth, in a domestic situation, the first thing officers are trained to do is separate the person in crisis from their family members because often even their presence can cause increased anxiety, which they failed to do.

31. Fifth, officers were all informed that Mary Alice was in the back yard. A female officer was outside and was capable of getting a visual on Mary Alice Love, who was just sitting on the patio, yet they did not wait for the officer outside to get eyes on her before proceeding toward the back sliding door.

32. Sixth, they allowed Jeffry Love to lead them toward the back door which puts a potential victim in harm's way or may aggravate the suspect.

33. Seventh, the officer outside conveyed over the radio that Mary Alice Love had a knife on the table. Instead of simply closing and locking the sliding door, officers decided to grab Jeffry by the arm and pull her back from the door to the ground, escalating the non-violent encounter into a violent one.

34. Eighth, Sergeant Brigano then escaladed the situation by reaching over with his left hand and grabbing Jeffry's robe and dragging her to the ground, causing her to fall over a case of water on the floor in front of Mary Alice Love. There was no lawful justification to pull Jeffry to the ground. Rather than reducing tension, this unnecessary use of force dramatically intensified the emotional environment inside the residence. Mary Alice Love, who had been seated on the back porch, observed officers forcing her mother to the ground. She immediately stood and exclaimed: "What the F*** are you doing to my mom?" This is what any child would do when somebody is attacking their elderly and frail mother.

35. Ninth, Officer Brigano never called for the bean bag shotgun which was in the car of one of the officers outside, a means of less lethal force when encountering a person with a knife.

36. Tenth, Officer Brigano never pulled out his taser when he was 6-7 feet away and protected by a couch, a less than lethal option readily available to him.

37. Eleventh, before Mary Alice even approached the door, Sergeant Brigano unholstered his weapon, disengaged the safety, and placed his service weapon in a high ready position when there was no threat of deadly force ever conveyed by Mary Alice.

38. Twelfth, Mary Alice never raised a knife, made any threatening statements to constitute the use of deadly force.

39. Thirteenth, Mary Alice never even entered the threshold of the door to justify the use of deadly force.

40. Fourteenth, Sergeant Brigano gave no verbal command before exercising lethal force.

41. Fifteenth, Sergeant Brigano shot over an innocent bystander, Jeffry Love's head, risking striking her with bullets.

42. Sixteenth, as Mary Alice attempted to open the sliding glass door to see who was assaulting her mother, Sergeant Brigano fired five to six rounds at her according to the medical examiner, killing her. Sergeant Brigano gave no announcement of his presence and more importantly no warning before firing. No reasonable effort was made to de-escalate the situation.

43. Seventeenth, the encounter unfolded within seconds, and from the time of entry until the shooting approximately two minutes elapsed, despite officers' knowledge that they were responding to a mental health crisis and the need for time and distance to be established was clear.

44. This case represents precisely the type of preventable tragedy that PERF's Guiding Principles, Crisis Intervention Team training, and the Illinois Law Enforcement Training and Standards Board's de-escalation curriculum were designed to prevent. Had Sergeant Brigano followed the principles upon which he was trained—including slowing the incident, creating time and distance, utilizing communication, avoiding unnecessary physical confrontations with family members, coordinating with behavioral health professionals, and issuing meaningful warnings before resorting to deadly force—Mary Alice Love would be alive today.

**<u>Count I</u>**
**Section 1983 Excessive Force Claim Against**
**Defendant officer CHRISTOPHER BRIGANO**

45. Plaintiff repeats, re-alleges and incorporates the foregoing paragraphs as though fully stated within this Count.

46. At the time and place detailed above, Defendant BRIGANO, while acting under the color of law, engaged in unnecessary, excessive, and objectively unreasonable force against MARY ALICE LOVE, when there were no reasonable grounds to do so.

47. MARY ALICE LOVE's actions did not justify the use of unnecessary, excessive, and deadly force by Defendant BRIGANO, and further, did not justify the rapid firing of five to six rounds.

48. Defendant BRIGANO's actions were malicious, willful and wanton, and constituted a reckless and deliberate indifference to MARY ALICE LOVE's constitutionally protected rights under the Fourth Amendment to the U.S. Constitution, while acting under the color of law.

49. As a direct and proximate result of the aforementioned actions and/or omissions of Defendant BRIGANO, MARY ALICE LOVE was deprived of the rights, privileges, and

immunities guaranteed by the Fourth Amendment to the U.S. Constitution, namely, MARY ALICE LOVE was subjected to an unreasonable use of force.

50. In addition, as a direct and proximate result of the aforementioned actions and/or omissions of Defendant BRIGANO, MARY ALICE LOVE was injured internally, externally and otherwise, both temporarily and permanently.

WHEREFORE, Plaintiff demands an award of compensatory damages against Defendant BRIGANO, and further demands punitive damages, costs and attorney fees, prejudgment interest, and any additional relief this Court deems equitable and just.

**Count II**
**Section 1983 *Monell* Failure to Train Claim Against Defendant**
**VILLAGE OF MUNDELEIN, ILLINOIS**

51. Plaintiff repeats, re-alleges and incorporates the foregoing paragraphs 1.-50. as though fully stated within this Count.

52. Defendant VILLAGE OF MUNDELEIN, ILLINOIS acted with deliberate indifference to the constitutional rights of MARY ALICE LOVE due to its failure to properly supervise, instruct, and train Defendant BRIGANO and his partner on the proper methods for the use of reasonable force when encountering citizens on a wellness check in her home, de-escalation of encounters with mentally ill citizens, and on the proper use of deadly force.

53. Defendant was acting under the color of law and acted with deliberate indifference to MARY ALICE LOVE’s rights under the Fourth and Fourteenth Amendments to the United States Constitution.

54. Defendant subjected MARY ALICE LOVE to these deprivations of her constitutional rights purposefully and/or knowingly.

55. MARY ALICE LOVE was injured and killed as a direct and proximate result of Defendant VILLAGE OF MUNDELEIN, ILLINOIS's actions.

WHEREFORE, Plaintiff demands compensatory damages from Defendant VILLAGE OF MUNDELEIN, ILLINOIS. Plaintiff demands judgment against Defendant VILLAGE OF MUNDELEIN, ILLINOIS and further demands costs, prejudgment interest, and attorney's fees against Defendants VILLAGE OF MUNDELEIN, ILLINOIS, as well as an injunction requiring the following: that the Defendant (1) institute a program requiring that deputies attend 40 hours of training annually on implicit bias, use of reasonable force, and concerning interactions with members of the public who have mental health issues; (2) retain a third-party expert on use of force to craft a use of force policy that takes into consideration implicit bias and members of the public with mental health issues; (3) retain a third-party expert on use of force to monitor the implementation of the use of force policy; (4) hire a full time mental health agency who can respond to mental health encounters within fifteen (15) minutes of a call or to otherwise mandate compliance with the WATT's law; and any additional relief this Court deems equitable and just.

**Count III**
**Indemnification Claim Against**
**Defendant VILLAGE OF MUNDELEIN, ILLINOIS**

56. In the event that any individual defendant is found liable for their actions performed in the course of his employment and/or agency with the MUNDELEIN police department, Defendant VILLAGE OF MUNDELEIN, ILLINOIS must indemnify such employee for this verdict pursuant to 65 ILCS 5/1-4-6.

WHEREFORE, Plaintiff demands that Defendant VILLAGE OF MUNDELEIN, ILLINOIS pay any compensatory judgment against any individual defendants who acted in the

course of their employment and/or agency with the VILLAGE OF MUNDELEIN, ILLINOIS police department.

**Count IV**
**State Law Willful and Wanton Claim Against All Defendants**
**Wrongful Death Act**

57. Plaintiff repeats, realleges and incorporates the foregoing paragraphs as though fully stated within this Count.

58. Defendant BRIGANO was acting within the scope of his employment with the VILLAGE OF MUNDELEIN, ILLINOIS at all times relevant. Defendant VILLAGE OF MUNDELEIN, ILLINOIS, is thus vicariously liable for Defendant BRIGANO's acts and omissions.

59. Defendant BRIGANO owed a duty of care to MARY ALICE LOVE to not willfully and wantonly harm or kill MARY ALICE LOVE.

60. Defendant BRIGANO breached his duty of care by willfully and wantonly shooting, injuring, and killing MARY ALICE LOVE.

61. As a proximate result of one or more of the aforementioned acts or omissions, MARY ALICE LOVE was shot, sustained injuries, and died.

62. This action is being brought pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/1 et. seq., for the benefit of the heirs and next of kin of MARY ALICE LOVE.

63. MARY ALICE LOVE left surviving at the time of her death her heirs at law, who by reason of her death did sustain grief, sorrow, and pecuniary losses including, but not limited to, goods, services, and loss of society.

WHEREFORE, Plaintiff demands compensatory damages from all Defendants, and any additional relief this Court deems equitable and just.

**Count V**
**State Law Battery Claim Against All Defendants**
**Wrongful Death Act**

64. Plaintiff repeats, re-alleges and incorporates the foregoing paragraphs as though fully stated within this Count.

65. Defendant BRIGANO was acting within the scope of his employment with the VILLAGE OF MUNDELEIN, ILLINOIS, at all times relevant. Defendant VILLAGE OF MUNDELEIN, ILLINOIS, is thus vicariously liable for Defendant BRIGANO's acts and omissions.

66. Defendant BRIGANO intentionally engaged in the willful touching of the person of MARY ALICE LOVE and/or attempted to commit violence on the person of MARY ALICE LOVE.

67. As a proximate result of one or more of the aforementioned acts or omissions, MARY ALICE LOVE was shot, sustained injuries, and died.

68. This action is being brought pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/1 et. seq., for the benefit of the heirs and next of kin of MARY ALICE LOVE.

69. MARY ALICE LOVE left surviving at the time of her death her heirs at law, who by reason of her death did sustain grief, sorrow, and pecuniary losses including, but not limited to, goods, services, and loss of society.

WHEREFORE, Plaintiff demands compensatory damages from all Defendants, and any additional relief this Court deems equitable and just.

**Count VI**
**State Law Willful and Wanton Supervision and Retention Claim Against VILLAGE OF MUNDELEIN, ILLINOIS**
**Wrongful Death Act**

70. Plaintiff repeats, re-alleges and incorporates the foregoing paragraphs 1.-69. as though fully stated within this Count.

71. Pleading in the alternative, Defendant VILLAGE OF MUNDELEIN, ILLINOIS, owed a duty of care to MARY ALICE LOVE to not willfully and wantonly fail to supervise or retain Defendant BRIGANO as a police officer and to promote him to be a Sergeant.

72. Defendant breached its duty of care by willfully and wantonly failing to supervise and retaining Defendant BRIGANO, who was unfit and incompetent as a Sergeant.

73. As a proximate result of one or more of the aforementioned acts or omissions, MARY ALICE LOVE was shot, sustained injuries, and died.

74. This action is being brought pursuant to the Illinois Wrongful Death Act, 740 ILCS 180/1 et. seq., for the benefit of the heirs and next of kin of MARY ALICE LOVE.

75. MARY ALICE LOVE left surviving at the time of her death her heirs at law, who by reason of her death did sustain grief, sorrow, and pecuniary losses including, but not limited to, goods, services, and loss of society.

WHEREFORE, Plaintiff demands compensatory damages from all Defendants, and any additional relief this Court deems equitable and just.

**JURY DEMAND**

Plaintiff demands trial by jury.

Respectfully Submitted,

/s/ Kevin W. O'Connor
Kevin W. O'Connor

Kevin W. O'Connor (IL Bar No. 6216627)
O'Connor Law Firm, Ltd.
100 S. Wacker Drive, Suite 350
Chicago, Illinois 60606
(312) 906-7609
koconnor@koconnorlaw.com
firm@koconnorlaw.com